IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MAURICE WOODARD,)
    Petitioner,)
)    Civil Action No. 07-225 Erie
v.)    Magistrate Judge Baxter
FRANKLIN TENNIS, et al.)
    Respondents.)

**<u>OPINION AND ORDER</u>**[1]

Petitioner, Maurice Woodard, is a state prisoner currently incarcerated at the State Correctional Institution Rockview, located in Bellefonte, Pennsylvania. Pending before the Court is his Amended Petition For Writ of Habeas Corpus [Docket No. 20], which he has filed pursuant to 28 U.S.C. § 2254.[2] For the reasons set forth below, Woodard's request for habeas relief is denied.

**I.**    **BACKGROUND**

Between 11:00-11:30 p.m. on February 29, 2004, two masked men entered the unlocked front door of the apartment of James Allen and his girlfriend Kelly Phillips, located in Erie, Pennsylvania. (9/16/04 Trial Tr. at 20-23). The assailants were wearing black coats with hoods covering their heads. (Id. at 27, 37). Each assailant's face was covered from the nose down by a piece of cloth described at trial as a "do-rag." (Id. at 23, 26). At the time of the break-in, Allen and Phillips were playing cards at the kitchen table with Allen's mother, Ruth Ranson.

The first assailant had a gun and ordered Allen, Phillips, and Ranson to hand over all of their money and marijuana. (Id. at 24). That assailant grabbed Phillips and dragged her into the

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have an United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.

[2] Respondent has submitted a hard copy of the state court record ("SCR"), which contains documents indexed 1 through 31. Documents contained therein shall be cited to as "SCR No. __ ." Respondents also have submitted the Reproduced Record ("RR") from Woodard's first post-conviction appeal at <u>Commonwealth v. Woodard</u>, Docket No. 1463 WDA 2005 (Pa.Super). The record is continuously paginated from 1a through 498a, and shall be cited to as "RR at __."

bedroom. (Id. at 29-30, 88). He hit her several times with the handle of his gun. Phillips begged him not to hurt her. She packed a stereo into a bag at his direction and gave him money. (Id. at 69). The first assailant then bound Phillips's eyes, mouth, and hands with duct tape and brought her out into the living room. (Id. at 69-76). In the meantime, the second assailant hit Allen several times and restrained him. (Id. at 25, 29-33, 40). After about 20-30 minutes, the assailants left the apartment through a back door. (Id. at 32). They stole the victims' money and cell phones, two purses, a gold necklace, and the stereo. (Id. at 77).

The victims immediately called the police and Officer Craig Stoker responded to the scene by 11:34 p.m. Allen and Phillips knew Woodard and told Officer Stoker that he was the first assailant. They could not identify the second assailant. Ruth Ranson could not identify either assailant. (Id. at 132-33, 139-41).

The police arrested Woodard on March 3, 2004, at a motel in Millcreek, Pennsylvania. They found among his possessions a black coat and a "do-rag." (Id. at 137-41). Woodard was charged with unlawful restraint; burglary; criminal conspiracy to commit burglary and robbery; three counts of robbery; three counts of simple assault; and, three counts of terroristic threats. He hired Dennis V. Williams, Esquire, to represent him.

Woodard's two-day trial commenced on September 16, 2004. The Honorable Ernest J. DiSantis presided. Allen, Phillips, Ranson, and Officer Stoker testified for the Commonwealth. The defense presented no witnesses.

Allen testified that there was no doubt in his mind that Woodard was the first assailant. (Id. at 28). He stated that he had known Woodard for about 10-12 years;[3] that Woodard is "not a stranger to me"; and, that he had seen Woodard about 5-6 times in the past several years and in fact had seen him as recently as a few days before the February 29, 2004, incident. (Id. at 25-28, 55-57, 61-62). Allen explained that although the assailants' faces were masked from the nose down, he immediately recognized Woodard by his voice and his walk. (Id. at 25-28, 61-62). He also testified that the second assailant called the first assailant "Moe," which is Woodard's

---

[3] Woodard is the half-brother to James Allen's nephew, Corey Allen.

-2-

nickname. (Id. at 61). Allen stated that the do-rag and coat that the police had recovered from Woodard's motel room looked like the same items that the assailants wore during the robbery. (Id. at 27-28).

Phillips also testified that Woodard was the first assailant. She said that she recognized him when his do-rag slipped down and she saw his eyes and nose. (Id. at 71-72, 96-97). Phillips said that, like Allen, she heard the second assailant call the first assailant by Woodard's nickname "Moe." (Id. at 76). She testified that she had known Woodard for a couple of months, that he had been "at our house… a couple of times[,]" and that he had been there as recently as a week before the incident. (Id. at 73, 87, 113). Phillips stated that the do-rag recovered from Woodard's motel room matched the one that the first assailant had been wearing during the robbery and that the coat that was recovered resembled the one that the second assailant had been wearing. (Id. at 67).

Officer Stoker testified that in his interview with Allen immediately after the incident, Allen "was very confident" that the first assailant was Woodard. (Id. at 139). He also testified that Phillips told him during his interview of her the night of the incident that "the guy with the gun…was the defendant, Maurice Woodard." (Id. at 132-33).

The defense strategy was to create reasonable doubt in the minds of the jurors by discrediting Allen's and Phillips's identifications during cross-examination. Petitioner's Attorney, Dennis Williams, had some success exposing weaknesses in Phillips's identification. Although Officer Stoker testified that Phillips had identified Woodard the night of the incident, Phillips stated on cross-examination that she did not immediately tell the police that Woodard was the first assailant. (Id. at 79-85, 98-101). Williams also highlighted a written statement that Phillips had given to the police on March 1, 2004,[4] in which she did not mention Woodard's

---

[4] Phillips's March 1, 2004, statement is at RR 498a. In that statement, she described briefly what occurred during the incident. She referred to the assailants as "[two] mask[ed] men dressed in black clothing." When she wrote of the assailant that had dragged her into the bedroom and had hit her, she referred to him simply as "he." Phillips did not identify either assailant in the statement. She did not state therein whether she could, or could not, identify either man. At trial, she testified that when she wrote this statement, she was "scared and shooken up." (9/16/04 Trial Tr. at 83).

name. (Id.) Phillips also left open the possibility that she may have told her friend Renee Jethro that she could not identify the first assailant. (Id. at 107-11). And, she admitted factors that may have affected her ability to make an accurate identification, such as: she had been very upset when she spoke with Officer Stoker; she had suffered a concussion as a result of the blows to the head that she had received at the hands of the first assailant; she had been taking anti-depressant medication and sleeping pills at the time of the incident; and, she did not know Woodard well. (Id. at 86-89, 97-104).

Allen's identification was less susceptible to attack. He was sure that Woodard was the first assailant. He knew Woodard well and had confidently identified him to Officer Stoker the night of the incident. There was no apparent motive for Allen to lie about Woodard's participation in the crimes.

On September 17, 2004, the jury announced its verdict. It found Woodard guilty on all charges. On December 2, 2004, he was sentenced to serve an aggregate term of imprisonment of 12-36 years. Woodard did not file a direct appeal.

On March 21, 2005, Woodard (through new counsel Elliot J. Segel, Esquire) filed a motion for collateral relief (SCR No. 12) pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46, which he supplemented on May 5, 2005 (SCR No. 14). He raised several claims in his PCRA motion, one of which is relevant to the instant habeas proceeding. Woodard claimed that he was at the home of Heather Garczynski at the time the crimes occurred and that Attorney Williams was ineffective for failing to investigate and present that as an alibi defense. As part of this claim, Woodard asserted that Attorney Williams should have called Garczynski, her 10-year-old son, and his girlfriend Maggie Smith as alibi witnesses. According to Woodard, they would have testified that he was at the Garczynski home at the time the crimes were committed.

A PCRA evidentiary hearing was conducted on June 9, 2005. Garczynski, Williams, and

Dennis Lagan testified.[5] Lagan is the private investigator that Attorney Williams retained around March 5, 2004, to assist with trial preparation. (PCRA Hearing Tr. at 10-11). It was established that Woodard initially had thought that he was being charged with committing the crimes around 1:30 a.m. on March 1, 2004. (Id. at 50-51; see also *3/25/04 Facsimile*, Def's PCRA Ex. C, RR at 447a-49a). Attorney Williams visited Woodard in jail as soon as he was hired, and at the time of this first meeting neither Woodard nor Williams had seen a copy of the criminal complaint, which indicated that Woodard actually was being charged with committing the crimes two hours earlier – at 11:30 p.m. on February 29, 2004. (Id. at 51, 60-61). Woodard and Williams discussed a possible alibi defense, and Woodard gave Williams a list of potential alibi witnesses. (Id. at 51-53, 67-75, 81-82). Apparently, Woodard did not indicate that he may have been at Garczynski's home at or around the relevant time period.[6] (Id. at 51-53, 67-75, 81-82).

Lagan testified that by the time he met with Woodard on March 22, 2004, Woodard had become aware that he was being charged with committing the crimes at approximately 11:30 p.m. on February 29, 2004. Woodard explained to Lagan at that meeting that the "alibi witnesses originally provided [to Williams] were no longer relevant." (*3/25/04 Facsimile*, Def's PCRA Ex. C, RR at 448a). He told Lagan that he was at Garczynski's home at the time the crimes were committed and he asked Lagan to interview her. (Id.)

Lagan interviewed Garczynski that same day (on March 22, 2004), and she gave him a written statement that Woodard and Maggie Smith were at her residence from around 8:00 p.m. on February 29, 2004, until around 1:00-1:30 a.m. on March 1, 2004. Garczynski also wrote in the statement that her 10-year-old son could testify that Woodard and Smith were at her home

---

[5] Woodard's mother Olivia Brock also testified at the PCRA hearing. Her testimony is not relevant to the claims before this Court.

[6] Williams testified: "[Woodard's] initial discussion with me had him elsewhere at 11:30 so he couldn't be two places at the same time, but the different alibis said that was the case." (PCRA Hearing Tr. at 71). He further testified that: "Miss Garczynski's statement was very explicit that she had been with Mr. Woodard along with her child and Maggy [sic] Smith from eight p.m. until 1:30 – 1:30 a.m.…That differed from what Mr. Woodard had told me previously, and so I discussed those issues with him." (Id. at 82).

that night. (PCRA Hearing Tr. at 12-13; see also *Garczynski's 3/22/04 Statement*, Def.'s PCRA Ex. D, RR at 450a). On March 25, 2004, Lagan faxed to Williams a summary of Garczynski's statement. (Id. at 12-13; *3/25/04 Facsimile*, Def's PCRA Ex. C, RR at 447a-49a).

Garczynski testified at the PCRA hearing that she was willing and available to testify at Woodard's trial. She said that she anticipated that Williams was going to contact her and call her as a witness for the defense, but that she did not hear from him. (Id. at 42-43).

Williams testified next, and he explained that he had "various conversations" with Woodard "regarding an alibi and why we weren't filing [a notice of alibi defense]." (Id. at 50-51). He said that he considered Woodard's alibi to be "weak" and determined that presenting it to the jury would be harmful to the defense. (Id. at 51-52, 76-77). William advised Woodard that he "was better off challenging the credibility of the identification evidence rather than pursuing the alibi evidence." (Id. at 76). He also testified that Woodard agreed that no alibi defense should be presented. (Id. at 50-55, 69-70).

Williams explained that he considered Woodard's alibi to be weak for several reasons. First, he questioned the veracity of Woodard's assertion that he was at Garczynski's residence at the time crimes occurred. He stated that when Woodard first explained to him his whereabouts on the night in question (when he thought that he was being charged with committing the crimes at 1:30 a.m. on March 1, 2004), Woodard did not indicate that he was with Garczynski at or near 1:30 a.m. Thus, although Woodard would later assert that he was at Garczynski's residence at the time the crimes occurred and Williams was informed that Garczynski was willing to testify to support that assertion, Williams was not convinced that her testimony (or any testimony supporting the alibi) would be truthful. (Id. at 62-77, 81-84).

Second, Williams had determined that it was in Woodard's best interest not to testify at trial and that that would hurt any alibi defense. (Id. at 51-54, 84). He explained that when he and Woodard discussed presenting such a defense, they contemplated the related issue of whether Woodard should testify to support it. Williams advised Woodard against testifying because he had *crimen falsi* convictions in his criminal record, which the Commonwealth would

-6-

be permitted to introduce to impeach his credibility.[7] (Id. at 52, 87). He said that he told Woodard that "in all the years I've practiced law if a person did not testify as part of their alibi, even though they didn't have to, that the alibi became much, much weaker." (Id. at 51).

Third, Williams said that Woodard's alibi defense was weak because Woodard would not permit Maggie Smith to testify in support of it.[8] He stated that Woodard had told him that he was with Smith during the relevant time period, but that Woodard also had consistently maintained that he did not want Smith to testify at trial because she was "not happy with" him and they were "not a happy couple at the moment[.]" (Id. at 51-54, 83-88).[9] Because Woodard insisted that he did not want Smith to testify and said that "she would not help him," Williams did not interview her or consider calling her as a witness. (Id. at 83).

On July 15, 2005, the PCRA Court (Judge DiSantis) issued an Opinion denying PCRA relief.[10] (SCR No. 17, Commonwealth v. Woodard, Criminal Division No. 1825 of 2004, slip op. (C.P. Erie July 18, 2005) (hereinafter "*PCRA Court Opinion"*). The PCRA held that "[a]lthough an alibi defense would not have been inconsistent with the challenge to the identification, it may well have disintegrated and/or detracted from the strong defense of lack of identification. Therefore, trial counsel's decision to forgo the alibi was reasonable." (*PCRA Court Opinion* at 9-10).

Woodard appealed to the Superior Court of Pennsylvania. (See *Brief For Appellant* in Commonwealth v. Woodard, Docket No. 1463 WDA 2005 (Pa.Super.)). On July 21, 2006, the

---

[7] See Commonwealth v. Garcia, 712 A.2d 746, 748-49 (Pa. 1998) (explaining when and how a defendant's history of *crimen falsi* crimes may be admitted at trial).

[8] Smith did not testify at the PCRA hearing, nor does it appear that she submitted an affidavit in that proceeding. Thus, there is no evidence that she was available or willing to testify for the defense.

[9] Smith was in jail in Cleveland at the time that Williams was preparing Woodard's defense, and Williams contemplated the possibility that her testimony would be subject to impeachment for possible *crimen falsi* convictions as well. (PCRA Hearing Tr. at 51). However, since Woodard was adamant that he did not want Smith to be called as a witness, Williams did not investigate her criminal record. (Id. at 51, 83, 87-88).

[10] Woodard filed a motion to vacate and reconsider in which he challenged the PCRA Court's refusal to permit him to call Williams as a witness in his case-in-chief during the PCRA hearing. (SCR No. 19). The PCRA Court denied the motion on August 3, 2005. (SCR No. 20).

-7-

Superior Court issued a Memorandum affirming the denial of PCRA relief. (SCR No. 23, Commonwealth v. Woodard, Docket No. 1463 WDA 2005, slip op. (Pa.Super. 2005), hereinafter "Woodard I"). It held that Williams's decision to forgo an alibi defense was objectively reasonable. (Woodard I, at 10-18). The Supreme Court of Pennsylvania denied the subsequent petition for allowance of appeal on March 21, 2007.

On July 30, 2007, Woodard filed a second PCRA motion. (SCR No. 25). In that motion, he contended that he is entitled to post-conviction relief based on "newly-discovered" evidence of his innocence. Specifically, he claimed that James Allen recanted his trial testimony. In support of his second PCRA motion, Woodard attached an affidavit purportedly signed by Allen on June 12, 2007, in which Allen wrote:

> I myself truly don't know who it was who robbed me, and Kelly Phillips doesn't know who it was because she told me that. We only thought it was [Woodard] because one guy called the other Moe, which is a nickname of his.

(Affidavit of James Allen, attached as Ex. A to second PCRA motion, SCR No. 25). Woodard requested that the PCRA Court conduct another evidentiary hearing and asked that Kelly Phillips be subpoenaed to testify. He did not allege that the prosecution knowingly used false evidence or otherwise claim any misconduct on the part of the police or the prosecution. (See SCR No. 25).

The PCRA Court denied the second PCRA motion "without a hearing as all allegations are either contradicted by the record, finally litigated, waived and/or patently frivolous, or not cognizable[.]" (SCR No. 26). Woodard appealed to the Superior Court and argued that the PCRA Court erred by denying his second PCRA motion without first conducting an evidentiary hearing to address the purported new evidence.

In the meantime, on or around August 21, 2007, Woodard commenced the instant action in this Court by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. [Docket No. 1]. He also filed a motion to stay this proceeding pending the resolution of his appeal before the Superior Court. [Docket No. 6]. This Court granted the motion and stayed this action pending the completion of Woodard's second PCRA proceeding. [Docket No. 8].

On February 19, 2008, the Superior Court issued a Memorandum affirming the denial of

the second PCRA motion. (SCR No. 31, Commonwealth v. Woodard, Docket No. 1600 WDA 2007, slip op. (Pa. Super. 2008), hereinafter "Woodard II."). It held that Woodard's claim was untimely under the PCRA's one-year statute of limitations[11] and that he failed to prove that the claim fell within the exception to the limitations period for "after-discovered" evidence of innocence, 42 Pa.C.S. § 9545(b)(1)(ii):

> Appellant argues after-discovered evidence in the form of a sworn affidavit by one of the victims, James Allen, purportedly obtained June 12, 2007, recanting his inculpatory trial testimony.
>
> To obtain relief upon newly discovered evidence, the appellant must establish the evidence (1) was discovered after trial and could not have been discovered earlier with due diligence; (2) is not cumulative; (3) is not being used solely to impeach credibility; and (4) would likely compel a different verdict. Commonwealth v. Washington, 592 Pa. 698, 927 A.2d 586 (2007). "We have held that, as a general matter, after-discovered evidence of this nature, recanted testimony, is notoriously unreliable, particularly where the witness claims to have committed perjury." Id. at __, 927 A.2d at 597 (citation and quotation omitted). "We have also said, however, even as to recantations that might otherwise appear dubious, the PCRA court must, in the first instance, assess the credibility and significance of the recantation in light of the evidence as a whole." Id. (citation and quotation omitted).
>
> The petition before the PCRA court and this Court, unlike that in Washington, is untimely on its face…. While the court didn't precisely address the credibility of Allen's statement, it did find the recantation, which was the sole basis for appellant's untimely petition, was contradicted by the evidence of record which identified appellant as the perpetrator of the crimes of which he was convicted.
>
> Allen's recantation does not serve to exculpate the appellant; while Allen avers he "truly doesn't know" who robbed him, he states, nonetheless, that he believed one of the culprits was appellant because one assailant called the other assailant "Moe," and that is appellant's nickname. Rather than exculpate appellant, this statement serves to incriminate him. Another victim, Kelly Phillips, Allen's girlfriend, testified at trial that she was able to identify one of the masked men as appellant because his do-rag fell away from his face and she saw his eyes. Further, Allen and Phillips both identified appellant to the officer at the scene at trial.
>
> Allen's sworn statement, at best, could be used to impeach his prior

---

[11] Under Pennsylvania law, the timeliness of a PCRA motion is a jurisdictional threshold consideration. (Woodard II, at 4 (citing Commonwealth v. Murray, 753 A.2d 201, 203 (Pa. 2000)). A PCRA motion, including a second or subsequent motion, must be filed within one year of the date a defendant's judgment of sentence becomes final, unless the motion meets an exception to the timeliness requirement. 42 Pa.C.S.A. § 9545(b)(1). The exception that was at issue in Woodard's second PCRA proceeding was the one that permits a motion based upon after-discovered evidence of innocence to be filed within 60 days of the date the claim could have been presented. Id. § 9545(b)(1)(ii) & (b)(2).

> testimony. See Washington, supra. Moreover, the fact that Allen still, in his statement, acknowledges that the culprit at the scene was called "Moe," appellant's nickname, Allen's statement serves to bolster the identification of victim Phillips. We further note that appellant has not provided an explanation for why Allen's recantation only recently came to light, especially if appellant is innocent as averred at trial and now maintained. Because appellant has failed to establish the recantation is exculpatory evidence of which he was unaware at the time of trial, we find it not after-discovered evidence that would act to overcome the PCRA time bar and make appellant eligible for PCRA relief. See 42 Pa.C.S.A. § 9545(b)(1)(ii); see also 42 Pa.C.S.A. § 9543, Eligibility for relief (a) General rule.– (2) … (vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(Woodard II, at 6-8) (record citations and brackets omitted).

After the Superior Court issued Woodard II, this Court lifted the stay and this proceeding resumed. Woodard filed several motions for an extension of time to file an amended petition for habeas relief, which this Court granted. [See Docket Nos. 13-15, 19]. On August 7, 2008, Woodard filed a 59-page *Amended Petition For Writ Of Habeas Corpus And Memorandum Of Fact And Law In Support* [Docket No. 20] (hereinafter "*Amended Petition*"), in which he raises the following two claims:

| | |
|---|---|
| Claim A | Williams was ineffective for failing to present an alibi defense and for failing to call Heather Garczynski and Maggie Smith as alibi witnesses (id. at 20-55); |
| Claim B | His due process rights have been violated because the state court relied on an unreasonable determination of fact and law in denying him an evidentiary hearing regarding James Allen's recantation (id. at 55-59). |

## II. Discussion

### A. Claim A

Because the Superior Court denied Claim A on the merits, this Court must review it under AEDPA's deferential standard of review. 28 U.S.C. § 2254(d). AEDPA provides, in relevant part, that when a state court has adjudicated a claim on the merits, a federal habeas court shall not grant the writ unless the state court's adjudication of the claim "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1). See also Williams v. Taylor, 529 U.S. 362,

405-06 (2000); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).[12] If the state court's adjudication was not "an unreasonable application of" of the law, id. § 2254(d)(1), a petitioner can receive habeas relief only if he shows that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. § 2254(d)(2).

The "clearly established Federal law" for AEDPA purposes in which to review a claim of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Supreme Court held that in order to prevail on a claim of ineffective assistance, a petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness.[13] 466 U.S. at 687-91. This is difficult demonstrate, as the law presumes that counsel's performance was effective. Id. The Supreme Court has explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted). The Court of Appeals for the Third Circuit has noted that it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United States v. Gray,

---

[12] Under AEDPA, habeas relief also is available to a petitioner if he shows that the state court's adjudication of his claim resulted in a decision that was "contrary to" clearly established federal law. 28 U.S.C. § 2254(d)(1). See Lambert, 387 F.3d at 234. Few state court decisions will be "contrary to" federal law, and the Superior Court's adjudication of Claim A in this case was not. Werts v. Vaughn, 228 F.3d 178, 202-04 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted [the federal standard] and thus was not 'contrary to' established Supreme Court precedent.").

[13] Under Strickland, a petitioner must also show that he suffered prejudice, meaning that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 691-95.

-11-

878 F.2d 702, 711 (3d Cir. 1989)).

Woodard has not overcome the law's strong presumption that Williams's decision to forgo an alibi defense fell outside the wide range of reasonable professional assistance, much less that the Superior Court's adjudication of Claim A was an objectively unreasonable application of Strickland or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)-(2). Williams testified that he was well aware of what Garczynski and her son would say if called as witnesses for the defense, but he did not present their testimony because he believed Woodard's alibi lacked credibility.[14] Williams also concluded that, even if it could be said that Garczynski's and her son's testimonies were sufficiently trustworthy to present, an alibi defense would suffer because Woodard did not want Smith to testify and because it was in Woodard's best interest not to testify himself. In Williams's opinion, the absence of Woodard and Maggie Smith from the witness stand would weaken what he considered to be an already weak alibi. He thus determined that presenting a defense lacking in credibility, or which was otherwise weak because Woodard and Smith should not testify to support it, would detract from the more viable defense of attempting to discredit the victims' identification.

Here, Williams's PCRA testimony established that his decision not to present an alibi defense was an adequately informed strategic choice. He articulated objectively reasonable bases for that strategic choice and made precisely the type of decision that should not be second guessed by a habeas court. Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); see also Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005) ("where it is shown that a particular decisions was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively unreasonable becomes 'virtually unchallengeable.'"); Lewis v. Mazurkiewicz, 915 F.2d 106, 115 (3d Cir. 1990) ("[W]hether or not some other strategy would

---

[14] Williams had an ethical obligation not to knowingly present false evidence, and it cannot be said that his hesitancy to submit evidence that he considered to be lacking in trustworthiness was objectively unreasonable. See Commonwealth v. Wells, 578 A.2d 27, 33 (Pa. Super. 1990) ("Counsel is not a guarantor of the outcome of the trial, nor may counsel ethically or legally present false evidence to a court. When a defendant's guilt is demonstrable, as here, the absence of a viable defense is the result of the defendant's guilt and not counsel's ineffectiveness.").

have ultimately proved more successful, counsel's advice was reasonable and must therefore be sustained.").

### B. Claim B

In Claim B, Woodard contends that his due process rights were violated because the PCRA Court erred in denying his second PCRA motion without conducting an evidentiary hearing. This claim is not cognizable in federal habeas corpus. In order for Woodard to obtain federal habeas relief, he must demonstrate that his *conviction* was obtained in violation of his federal constitutional rights. 28 U.S.C. § 2241(c)(3); § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Errors that allegedly occur during a *post-conviction PCRA proceeding* do not provide a basis for habeas relief. As the United States Court of Appeals for the Third Circuit has explained:

> The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; *what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation*.

Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) (internal citations omitted) (emphasis added); see also Lambert, 387 F.3d at 247 ("[A]lleged errors in collateral proceedings are not a proper basis for habeas relief from the original conviction.").[15]

It may be that Woodard is seeking to litigate an "actual innocence" claim based upon James Allen's recent assertion that (contrary to what he testified to under oath at trial and what he told Officer Stoker the night of the incident) that he does not know who robbed him.[16] If

---

[15] Additionally, under Pennsylvania law the right to a PCRA hearing is not absolute and the PCRA Court had the discretion to deny Woodard's request for a hearing. See, e.g., Commonwealth v. Jordan, 772 A.2d 1011, 1014 (Pa.Super. 2001); Pa.R.Crim.P. 907. Whether the PCRA Court properly exercised that discretion is a state law question that a federal habeas court has no authority to review. See, e.g., Estelle, 502 U.S. at 67 ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (internal quotations and citation omitted).

[16] As the Superior Court observed, James Allen's recantation is not entirely exculpatory because he still maintains that he heard the second assailant called the first assailant by Woodard's nickname "Moe."

Woodard is raising such a claim, it is denied. In a non-capital federal habeas case, a petitioner's claim that he is actually innocent of the crimes for which he was convicted does not state a claim that is cognizable under the federal habeas corpus statute unless the petitioner attaches that actual innocence allegation to a constitutional claim (for example, a claim that the prosecution suppressed evidence of that innocence).[17] The United States Supreme Court's decision in Herrera v. Collins, 506 U.S. 390 (1993), illustrates why this is so.

In Herrera, the Supreme Court held that federal habeas review is not available "absent an independent constitutional violation occurring in the underlying state criminal proceeding" and that "a claim of 'actual innocence' is not itself a constitutional claim." 506 U.S. at 400, 404. The Court explained that once a defendant is found guilty after a fair trial in the state court, he no longer is entitled to a presumption of innocence, and thus comes before the federal habeas court not as one who is innocent, but as a convicted criminal. Id. at 399-400. It held that because such a determination in the state criminal trial is "a decisive and portentous event" and "[s]ociety's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the guilt or innocence of one of its citizens," freestanding claims of actual innocence are not reviewable in federal habeas actions. Id. at 401 (internal quotations and citations omitted). The Supreme Court noted that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution–not to correct errors of fact." Id. at 400. "Federal courts are not forums in which to relitigate state trials." Id. at 401 (quotations and citation omitted). Thus, the Supreme Court rejected Herrera's claim that, even if the proceedings that resulted in his conviction and sentence were entirely fair and error free, his innocence would make his execution a constitutionally

---

[17] Woodard raised his "actual innocence" claim in the state court under a provision of the PCRA that is meant to address claims of actual innocence based upon newly-discovered evidence. 42 Pa.C.S. § 9543(a)(2)(vi). This provision of the PCRA does not have a comparable counterpart in the federal habeas statute. See, e.g., Albrecht v. Horn, 485 F.3d 103, 122-23 (3d Cir. 2007). Thus, as the foregoing discussion of Herrera v. Collins, 506 U.S. 390 (1993) demonstrates, while the PCRA provides for "actual innocence" claims, the federal habeas statute requires in non-capital cases "actual innocence plus a constitutional violation." Id. at 122 (citing Herrera).

intolerable event.[18]

Based upon the Herrera decision, the United States Court of Appeals for the Third Circuit repeatedly has emphasized that in non-capital cases: "It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004) (quoting Herrera, 506 U.S. at 400); Albrecht, 485 F.3d at 121-22. Therefore, to the extent that Woodard is claiming that he is entitled to habeas relief because James Allen's recantation establishes his actual innocence, that claim is denied.

Finally, the Court notes that in his *Amended Petition* Woodard does state that he believes that Allen's and Phillips's trial testimony "was the product of prosecutionial [sic] misconduct: perjury provided to Allen & Phillips by police." [Docket No. 20 at 58]. If he is raising a claim that his due process rights were violated because the prosecution knowingly presented false evidence at trial, see Giglio v. United States, 405 U.S. 150, 153 (1972), that claim is denied. He did not raise it before the state court (see SCR No. 25) and therefore failed to exhaust it and it is now procedurally defaulted.[19] However, even if Woodard could overcome the default and

---

[18] In Herrera, the Court left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417 (emphasis added). In House v. Bell, 547 U.S. 518 (2006), the Court once again left open the question of whether a truly persuasive freestanding innocence claim in a capital case would warrant federal habeas relief if no state avenues of relief remain available. Id. Recently, in District Attorney's Office for the Third Judicial District v. Osborne, __ S.Ct. __ , No. 08-6, 2009 WL 1685601 (June 18, 2009), which was a non-capital case in which a state inmate brought an action under 42 U.S.C. § 1983 to compel the State of Alaska to release biological evidence so that it could be subject to DNA testing, the Supreme Court in *dicta* assumed without deciding that an actual innocence claim could be brought in habeas, but noted "the high standard any claimant would have to meet" to succeed with such a claim. Id. at *13 (citing House and Herrera). Suffice it to say that if indeed an actual innocence claim could be brought in a non-capital federal habeas case, the statements contained in James Allen's affidavit (in which he still maintains that the second assailant addressed the first assailant by Woodard's nickname) falls far short of the quality of new evidence of innocence that would entitle Woodard to habeas relief.

[19] To satisfy the exhaustion requirement with respect to a due process claim based upon James Allen's recantation, Woodard must have fairly presented that due process claim to each available level of the state court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). In Woodard's second PCRA motion, he did not allege that his due process rights were violated because the prosecution

-15-

receive merits review on a prosecutorial misconduct claim, it still would fail. The Court shall accept for the sake of argument that which is stated in James Allen's affidavit (that is, that he now claims that at least a portion of his trial testimony was untrue). Nothing in that affidavit supports a claim of prosecutorial misconduct. James Allen does not contend that Officer Stoker or any other police officer or member of the prosecution told him to make false statements at trial, or that they knowingly presented false evidence. Woodard simply offers no support for any claim that the prosecution committed misconduct in his case.

## C.     Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]" Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Applying those standards here, jurists of reason would not find it debatable whether Claims A and B should be denied. Accordingly, a certificate of appealability is denied.

---

suborned perjury or knowingly presented false testimony. Thus, he did not exhaust a due process claim based upon prosecutorial misconduct. Duncan v. Henry, 513 U.S. 364, 366 (1995) ("Mere similarity" of claims presented to the state and federal courts is "insufficient to exhaust.") As a result, to the extent that Woodard is raising such a claim here, that claim is now procedurally defaulted for failure to exhaust. See, e.g., Lines v. Larkins, 208 F.3d 153, 160 (3d Cir. 2000).

### D. Woodard's Motion For An Evidentiary Hearing Is Denied

Also pending before this Court is Woodard's motion for an evidentiary hearing. [Docket No. 26]. Because the PCRA Court did not conduct an evidentiary hearing on Woodard's second PCRA motion, this Court has the discretion to hold one here. See 28 U.S.C. § 2254(e)(2); Schriro v. Landrigan, 550 U.S. 465, 474-75 (2007); Thomas, 428 F.3d at 497-99. The Court declines to exercise that discretion because the parties have developed the record sufficiently for this Court to make a ruling. Landrigan, 550 U.S. at 474-75 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). Moreover, as set forth above, even if the Court accepts as true the averments made in James Allen's affidavit, Woodard still is not entitled to habeas relief. Id. at 475 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). Therefore, Woodard's request for an evidentiary hearing is denied.

### III. CONCLUSION

For the foregoing reasons, the *Amended Petition* [Docket No. 20] is denied, a certificate of appealability is denied, and the pending motion for an evidentiary hearing [Docket No. 26] is denied.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAURICE WOODARD,<br>    Petitioner, | )<br>)<br>) Civil Action No. 07-225 Erie |
| v. | ) Magistrate Judge Baxter |
| FRANKLIN TENNIS, et al.<br>    Respondents. | )<br>) |

## **O R D E R**

AND NOW, this 29th day of June, 2009;

IT IS HEREBY ORDERED that the *Amended Petition For Writ Of Habeas Corpus* [Docket No. 20] is denied and a certificate of appealability is denied. The Clerk of Courts is hereby directed to close this case.

IT IS FURTHER ORDERED that Petitioner's motion for an evidentiary hearing [Docket No. 26], is denied for the reasons set forth in the Opinion and Order issued today.

                                                                                        S/ Susan Paradise Baxter
                                                                                        SUSAN PARADISE BAXTER
                                                                                        United States Magistrate Judge